May it please the court. My name is Joseph Bui. I represent Club One Casino, plaintiff and appellant in this RICO action. Before I begin, I want to reserve three minutes for rebuttal. I also want to apologize for coming to you from my living room. I'm on a quarantine. You'd see the back of my office otherwise. But I guess I'll just go ahead and get started with my arguments. So I plan on raising two arguments today, time permitting. The first is that we plausibly allege RICO standing and more specifically that we suffered a direct injury due to defendant's RICO violation. The second is that to the extent the court disagrees, we should at least be given a chance to amend the complaint to fix any deficiencies with our RICO claims. We've never had an opportunity to do that. So let's just jump into what the complaint says. I'll admit that when I first looked at it, I was a little overwhelmed. It's long. But this case is actually very straightforward. We allege that defendants opened and operated an illegal cardroom business in close proximity to our lawful cardroom operations. That by so doing, defendants violated RICO pursuant to Chapter 18 of the United States Code. And that we suffered a direct injury as a result. Namely, the lost revenues and profits that any business would suffer when a competitor suddenly shows up in the market where they're operating. So what are the predicate acts? I mean, so there's lots of different predicate acts, but the short version. What's alleged as a predicate act? Sure. So the California Gambling Control Act sets strict requirements on who can lend money to fund, open, and operate a gambling business. All of these requirements are intended to keep criminal elements outside of gambling. So you really can't get a license if you have that type of background, at least without going through a pretty lengthy investigation, which they never did. The predicate acts comprise of their failure to get those licenses properly by disclosing the criminal backgrounds of the people they affiliated with. Sort of a fraudulent. Right. The licenses they obtained were fraudulent, but it becomes a RICO violation under 18 U.S.C. 1955, which makes clear that there's two components to the violation. One is that they violated the laws of a state or political subdivision in some way. Those are the predicate acts that we just discussed. The other is that they actually operate the gambling business. We see it in the language of the text. It makes clear that it's a violation to manage, to supervise, to conduct a gambling business. Okay. So how are those predicate acts the reason for your loss? Sure. Because conducting a gambling business is inherent in the RICO violation, their very presence caused us to lose customers. It's a pretty reasonable inference, I like to think. Is it a direct impact? It is. So I would – a good example is the one that they discussed in the Supreme Court in Bridge. So in that case, which was unanimously decided, the Supreme Court discusses a situation where proximate cause just kind of has to exist. And what they say is, okay, well, let's say a defendant lies to a business's customers or its suppliers, and the customers then stop going to that business. Proximate cause exists there, even though technically the customer is the person making the choice, because the thing that is animating the customer to make that choice is the RICO violation, the lie. That's exactly the same here. The RICO violation is their very presence. A customer can't choose to go to the 500 Club instead of Club One Casino if it doesn't exist. But the – go ahead, Judge Emery. But isn't this case much more like ONZA, where it's an unfair business advantage perhaps from the illegal conduct? In Bridge, there's a closed universe of loss, so the loss could be attributed directly to what happened. Why isn't this case like ONZA instead? Correct. That's a good question. So two things. First, in ONZA, the state was considered the direct victim because the scheme, the RICO violation, was state tax fraud, and the state suffered a direct concrete economic injury. That's similar to what this court said in Painters, where the prescription – the doctors who prescribed the drug were not considered the direct victim because they didn't suffer a direct economic injury as a result of the RICO violation. The second thing I'd say is that what ONZA makes clear is that when you determine whether or not a plaintiff has been directly injured by a RICO violation, what you look at is the conduct that amounts to the violation. And here, the conduct that amounts to the violation, as I previously mentioned, is their actual operation of an illegal gambling business. Do you know if your clients – how has this whole COVID thing impacted your clients? I mean, I really can't say. The reason I'm asking that is because, I mean, sure, people could not go to your client because they're going to another 500 club, but they also could be not going to your clients for other reasons. That's sort of the problem, I think, the root problem, when it's not a direct injury, when it's not a closed universe, so to speak. So, thank you for asking that question. It reminds me of another reason why I think this case is similar to Bridge. I mean, I would argue we are in a pretty closed universe. I mean, the allegations make clear that we are both operating in a small market in the Central Valley. It's not a community that attracts tourists like in New York or in Las Vegas. We also offer a very specialized service, card rooms. They offer that same service. So, when they gain a customer, we lose one. It's not like they're creating new customers out of nowhere. Well, that might be true, but it might also be, even assuming that is true, it might also be true that you lose customers for other reasons. Sure. I mean, thank you for reiterating that point. I think at the motion to dismiss stage, the court is required to limit its inquiry to what is alleged in the complaint. And what this court said in Mendoza, and I quote, is that it is inappropriate at the pleading stage to substitute speculation for the complaint's allegations. That was pre-Iqbal Fomley where, you know, it just seems to heighten the pleading standard. I mean, there's actually cases that have said, the Fourth Circuit case, that actually say the problem with Mendoza, they distinguish Mendoza because of the pleading standard. You're running out of time. I do want to know, what would you, what will you actually allege that would be different if you're given leave from Mendoza? So, the district court dismissed our complaint based on a lot of speculative factors as to why we couldn't prove that this was the sole cause. I frankly submit that we don't have to prove that, but to the extent we need to, we could allege, for instance, that Carbon customers are very unique and loyal to Carbon businesses. That they aren't interested in any other casinos, to the extent those casinos even exist. That we've been in business in this location for several years. That we're the best party to tell you whether or not any of these other market conditions cause us to lose a 90% drop in revenue as soon as they enter the market. And nothing on the face of the complaint says that. And a qual entremly doesn't change that basic premise on a motion to dismiss. You limit your review to the allegation from the complaint. This case was pending for several years, though. Looking at the record, I didn't see that you had alleged specific facts to demonstrate any of those things. Why didn't you do that? Well, our position is that we just needed to put forth a plausible theory of causation. This court has said over and over that what matters is the fact of injury, not whether we have to disprove every other causal theory that's out there. And I think we established the fact of causation very clearly. We make clear that we're fighting for a finite pool of customers. That one of their owners, in fact, has agreed to a non-compete clause because they recognize the dynamic at play. That when they gain a customer, we lose one. We allege that they specifically intended to move from their poorly performing location to ours to take our revenues, our profits, and our customers. And as I mentioned before, we allege that we saw a 90% drop in revenue as soon as they came in. OK, you want to save the rest of your time for rebuttal? Yes, please. OK, we'll hear from the other side. Here, please, the court. Walt Whelan for the appellees. First of all, I think the key thing to focus on with respect to ANZA is that what was rejected by the court there was this same concept that the plaintiff here is trying to, has unsuccessfully tried to sell to the trial court. And that is that a market share analysis would get them past the proximate cause hurdle. And the court in ANZA rejected that. So when you boil it down, that's the key weakness in the plaintiff's approach on proximate cause. Let me ask you this. How do you respond to council's argument that it's kind of a closed market in this small community up in the Fresno area? Well, I happen to be from the Fresno area. It's not, frankly, there are other casinos and gambling locations in the immediate vicinity. Clovis, where the 500 Club is located, is, frankly, a more affluent community than downtown Fresno. So they are really, they are submarkets. They're situated near each other. But if it came to that, I think their premise is incorrect. It is certainly not analogous to the Bridges case, which is what they're trying to fit into. The Bridges case there was, of course, the tax lien sale that was, I think it was Cook County where that was done. And the problem was that with the illegal conduct that was engaged in by the defendant, it was a zero sum game where if the party that the aggrieved party for every instance where this scheme led to that, to the wrongdoer achieving a sale or being able to buy property through the tax lien, the aggrieved party lost that opportunity. And it was very much a closed market. It seems to me they could, I don't know whether it's true or not, but they could allege that this is, I think they say it's a certain type of card game or something that only these two have. So they could allege that, and I suppose maybe prove that. I think the one thing that would make this different than Bridges, in Bridges there's not some sort of third non-market related but possible reason why a lien sale wouldn't go through. It would be like as if there was some sort of, every once in a while just randomly a lien sale just disappears into the ether and nobody gets the lien. But I think in this instance, at least intuitively to me, it seems like there are got to be other reasons, the economy being a big one that could impact a casino like this. And I was asking the other council about that. But what is, I mean, I would assume for instance the COVID might have a really serious impact on it. Oh, of course, yeah. I mean, for one thing, Fresno County is in a red state, and that means all casinos are closed, and they've been in and out of that state going back. I'm assuming the time they're talking about is not COVID, so it's probably just an example I'm using. But what other things other than COVID, are casinos cyclical? Are they economically cyclical based on where the economy's at, other things? Not some person going from one casino to another one. What other impacts? Right. I mean, there's a multitude of factors. I mean, there's transportation issues that impact that. There's, as I mentioned before, there's affluence. The Columbus area where the 500 Club is located is a more affluent area than downtown Fresno. There are people that don't travel to downtown Fresno where there's a greater crime problem. So you have people that will go to the 500 Club in Clovis that would never go to downtown Fresno. Downtown Fresno is one of the crime capitals of California. That makes sense to me. But can I ask you, you know, he says their allegation is their revenue dropped 90% or something like that. It does seem somewhat intuitive that like a lot of that would be due to this competitor opening up. I mean, is your view that, yeah, probably sure some of that was, but not all of it. Yeah, I think that we couldn't reasonably argue that there is no impact at all. But I think as it adds, it instructs us that if there is a market share reduction that that does not meet the approximate cost test. And so I think that's our response. I think that your position. And I think that you may have a question about your position that as long as there's some other plausible thing. So as long as it's plausibly kind of an open system and not a closed system like a bridge, then you can't do to make a recall. Yes, I think I think it is distinguishable because you do have a variety of possible causations. It is hard to jive with Mendoza, I think, because it's hard for me to see that that's closed system. But I want to make sure that Democrats are. So my question, I did know, by the way, that it seemed that the gaming revenue actually declined 30 percent, but cash flow declined 90 percent. So I'm not sure what that distinction is. But to the point that Judge Van Dyke was making, is it possible also that the 500 Club does people like it better? Is that one of the factors that if they operate a better operation, is that one factor that's a possible reason for the revenue drop? Yes. And one of the things that needs to be mentioned, the suggestion was made that that the 500 Club was newly formed and never was properly licensed. The 500 Club has a history going back in time. They were they've been duly licensed. The problem that has been alleged that arose is that when this expansion occurred and they were still in the city of Clovis at that point in time, allegedly there were investors who did not obtain the proper licensing to be investors. OK, but the reality is that the 500 Club goes back decades in Clovis and there is a longstanding clientele that goes to the 500 Club. So just to clarify that, I think that's an important fact that needs to be factored into this whole thing. But yeah, I mean, I think the the reputation that the 500 Club has of being, you know, you know, more of a family oriented kind of arrangement. That's one thing. And yes, it's a different it's a different marketing approach, if you will. OK, so there's really so many different factors that contribute to this allegate alleged market loss. Everybody in that time frame, there were economic issues that impacted both card programs. OK, so it's just it's really no easy way to sort out all the causations here. Why shouldn't they get to amend their complaint? Well, I think the reason is that when you listen closely, what they're talking about, they're just talking about adding on additional predicate acts is the way I hear it. And I think they've had ample opportunity to articulate a clear theory that would get around Anza and they have not done so. There still is a problem with essentially trying to advance a diminution in market share theory for proximate cause. And that under answer, that doesn't get them where they need to get. So I think the trial court was accurate in saying, you know, what is it that you would tell us what you would do if you were going to have the opportunity to amend? And frankly, all that they said then and all that they've said up to this point in time is they would simply add additional predicate acts. And so the proximate cause issue is the is the key issue, obviously. And I there's no reason to give them further opportunity at this point because they've had ample opportunity to allege facts that would get them past that problem. Anything else? At this point, unless there's other questions from the panel, I would submit. OK. Rebuttal. You have about a minute. I'll give you a minute for a rebuttal. Thank you for that. So I'm just going to shoot this real quick. So they've admitted that we couldn't reasonably say that there was no impact at all. Bridge at footnote three makes clear that all you have to do is prove the fact of injury. That should that's just that should end the conversation. They say that we've had ample opportunity. We've had no opportunity. They say that. But you can't recover for lost profits. This court has said otherwise. Harmony is explicit. They expressly allowed leave to men precisely because you can recover for lost sales. You know, and that makes sense. Rico was enacted to Rico as an acted to protect lawful businesses from having to compete with those who engage in the legal tactics. It would make sense for Rico to explicitly allow business injuries if we couldn't actually cover for lost sales or lost profits. OK. OK. Thank you, counsel. We appreciate your arguments and the matter submitted at this time. Thank you. Thank you. Thank you.
judges: Paez, Immergut, Vandyke